UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH SEBESTA, individually, and as parent and next friend to ELIZABETH MARIE SEBESTA, a minor,<br><br>        Plaintiff,<br><br>   vs.<br><br>ANDREA DAVIS, in her individual capacity, BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, ELYSIA CHILDS, in her individual capacity, and GLORIA BEAN, in her individual capacity,<br><br>        Defendants. | )<br>)<br>) 12 C 7834<br>)<br>) Judge Feinerman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

On September 27, 2010, Elizabeth Sebesta gave birth to a baby girl at the University of

Illinois Medical Center ("UIMC") in Chicago. Doc. 102 at ¶¶ 1, 18-19. Officials from the

Illinois Department of Children and Family Services ("DCFS") threatened to place the girl in

protective custody unless Sebesta agreed to comply with a counseling program. Doc. 113 at

¶ 48. Sebesta completed the program and then brought this suit under 42 U.S.C. § 1983 and

Illinois law against Andrea Davis (a social worker employed by UIMC) and the University of

Illinois Board of Trustees (together, "University Defendants") for reporting Sebesta to DCFS and

for sharing Sebesta's medical records with DCFS, and against DCFS officials Elysia Childs and

Gloria Bean (together, "DCFS Defendants") for reviewing Sebesta's medical records,

"indicating" her as presenting a risk of neglect, and threatening to take her daughter. Doc. 46.

Earlier in the litigation, the court dismissed the claims based on the sharing of Sebesta's medical

records and allowed the other claims to proceed. Docs. 39-40 (reported at 2013 WL 5408796

(N.D. Ill. Sept. 26, 2013)).

After the court set a jury trial for April 18, 2016, Doc. 86, both DCFS Defendants and University Defendants moved for summary judgment on the remaining claims, Docs. 106, 115. The court set a briefing schedule requiring Sebesta to respond by September 15, 2015. Doc. 117. On Sebesta's motion, the court granted her an extension until October 15, 2015 and, in light of the impending trial date and February 4, 2016 motion *in limine* deadline (Doc. 84), stated that no further extensions would be granted. Doc. 122. Sebesta did not file her response papers by October 15, and on November 5, the date for filing replies, DCFS Defendants filed a short brief noting that Sebesta had not responded and arguing that, under Local Rule 56.1(b)(3), she had admitted all of the facts asserted in Defendants' Local Rule 56.1(a)(3) statements. Doc. 123.

In preparation for a previously scheduled December 2, 2015 status hearing, Doc. 117, the court prepared a detailed outline of an opinion resolving the summary judgment motions based on the factual predicate set forth in the Local Rule 56.1(a)(3) statements. At 5:08 a.m. on December 2, Sebesta filed a motion for leave to file *instanter* her response materials. Doc. 124. At the hearing that took place four hours later, the court set a briefing schedule giving Defendants until December 8 to respond to Sebesta's motion, giving Sebesta until December 11 to reply, and setting a further status for December 15. Doc. 126. Defendants timely responded, Docs. 127-128, and Sebesta did not reply. On December 15, the court denied Sebesta's motion in an oral ruling. Doc. 130. In this opinion, the court sets forth in writing the grounds for denying Sebesta's motion, and also grants both summary judgment motions.

## Background

### A. Sebesta's Motion for Leave to File *Instanter*

It is best to consider Sebesta's motion for leave to file *instanter* as a request for another extension of time to file her summary judgment responses. *See Keeton v. Morningstar, Inc.*, 667

F.3d 877, 883 (7th Cir. 2012) (treating a late motion for leave to file *instanter* a summary judgment response as a motion to extend the deadline for filing the response). Federal Rule of Civil Procedure 6(b)(1)(B) provides that when a party moves to extend a deadline that has already passed, the court must deny the motion unless the movant can show that her failure to meet the deadline was the result of "excusable neglect." *Ibid.* The determination whether a party's neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 395 (1993) (interpreting a parallel provision of the Federal Rules of Bankruptcy Procedure); *see also Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015) (applying *Pioneer*'s definition of "excusable neglect" to Civil Rule 6(b)(1)(B)); *Global Tech. & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 732 (7th Cir. 2015) (same); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006) ("We have held that *Pioneer* applies whenever 'excusable neglect' appears in the federal procedural rules."). Relevant circumstances include "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395; *see also Peters v. Wal-Mart Stores E., LP*, 512 F. App'x 622, 628 (7th Cir. 2013); *Raymond*, 442 F.3d at 606. A party is "accountable for the acts and omissions of [her] attorneys." *Pioneer*, 507 U.S. at 396; *see also Moje v. Fed. Hockey League, LLC*, 792 F.3d 756, 758 (7th Cir. 2015) ("[A] lawyer's errors are imputed to the client for the purpose of [excusable neglect].").

Although Sebesta's motion never mentions excusable neglect or Rule 6(b)(1)(B), it does attempt to offer an explanation for her attempt to file her response papers six weeks after the

October 15 deadline—principally, that Sebesta's lawyer, a sole practitioner, was too busy with other cases to prepare the responses in time. Doc. 124. But "a lawyer's busy caseload does not excuse late submissions." *Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 543 F. App'x 591, 594 (7th Cir. 2013); *see also Keeton*, 667 F.3d at 883 (rejecting a party's argument that, because her lawyer was dealing with dozens of other cases, his failure to file a timely request for an extension was excusable); *Harrington v. City of Chicago*, 433 F.3d 542, 548 (7th Cir. 2006) ("[I]t is widely accepted that neglect due to a busy schedule is not excusable."). This is so regardless of whether the lawyer is a sole practitioner. *See Harrington*, 433 F.3d at 548-49 ("Sole practitioner or not, Boyd, as a member of the bar, had duties to his clients, to opposing counsel, and to the district court ….").

In fact, the Seventh Circuit has held that excuses considerably more convincing than Sebesta's failure to satisfy Rule 6(b)(1)(B). The offending lawyer in *Keeton*, for instance, suffered a broken arm before the designated filing date, which made it more difficult for him to type. 667 F.3d at 883. Even so, the court held that the lawyer's neglect was inexcusable because he "failed to demonstrate that his illness was of such a magnitude that he could not, at a minimum, request an extension of time to file his response." *Ibid.*. In *Harrington*, the lawyer's father and sister died within two months of each other during the discovery period; the court held that the lawyer's failure to request an extension of the discovery deadline was inexcusable. 433 F.3d at 548. And in *Johnson v. Gudmundsson*, 35 F.3d 1104 (7th Cir. 1994), the Seventh Circuit held that, while a lawyer's family medical emergency "almost certainly would have been justification for an extension of filing deadlines, if sought prospectively," it could not justify his failure to seek an extension until after the deadline had passed. *Id*. at 1111. The same holds for Sebesta's counsel lack of dilatory performance in this case.

Even putting aside the settled rule that a lawyer's busy schedule cannot make neglect excusable, Sebesta's motion fares poorly under the *Pioneer* factors. The first factor is "the danger of prejudice to the [non-movant]" of allowing the extremely tardy filing of Sebesta's response materials. 507 U.S. at 395. Allowing that filing would have required the court to extend the summary judgment briefing schedule to give Defendants time to reply. In light of the pretrial and trial schedule, and to give the court sufficient time to digest a contested record and rule on contested summary judgment motions—while handling all of the other matters that it had slated for the relevant time frame—the reply deadline would have had to have been set during the holiday season or shortly thereafter. This would have been deeply prejudicial to defense counsel, who likely had holiday plans of their own and/or had scheduled other work during that time. The court alternatively could have pushed back the trial date, but that, too, would have prejudiced Defendants, who undoubtedly had set aside the time to prepare for and attend trial. Allowing Sebesta's tardy filing would have additionally prejudiced DCFS Defendants, who prepared a reply brief in support of their summary judgment motion. Doc. 123. Granting Sebesta's motion for leave to file would have rendered that brief obsolete.

The second *Pioneer* factor, "the length of the delay and its potential impact on judicial proceedings," also weighs against Sebesta. She did not just barely miss the October 15 deadline; she blew it by more than six weeks. And the delay already has affected judicial proceedings. As noted above, the court had prepared a detailed outline for resolving the summary judgment motions on the record set forth in Defendants' Local Rule 56.1(a)(3) statements before Sebesta filed her motion for leave to file, and it would have had to start over if it granted Sebesta's motion. *See Keeton*, 667 F.3d at 884 (acknowledging that a late filing prejudiced the district court where the court "had already gone through the effort of analyzing the case and drafting its

summary judgment Opinion"); *Garza v. Cervantes*, 2015 WL 468748, at *3 (N.D. Ill. Feb. 3, 2015) (in denying the non-movant's late request for an extension, considering that the court had already drafted its opinion resolving the substantive motion when the request was made).

The third *Pioneer* factor, "the reason for the delay," weighs heavily against retroactively granting an extension. "I was busy" is always a bad excuse for allowing an already-extended deadline to pass, but even as such excuses go, Sebesta's counsel's is particularly weak. Counsel reports, for example, that she needed to prepare an "expedited responsive brief" in another case between October 20 and December 1, but that period fell *entirely after* the October 15 deadline in this case; it in no way explains her missing the deadline to file the summary judgment responses or her failure even to seek the court's indulgence by asking for one more extension. Doc. 124 at ¶ 3. And the most important complication that counsel cites to explain her inaction—a mid-October trial in another case in the Northern District of Illinois—was the same matter she cited when she requested the first extension in September. Doc. 120 at ¶ 2; Doc. 124 at ¶ 2.

The fourth *Pioneer* factor is "whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395. There is no need to make a pronouncement on counsel's intentions, given the overwhelming strength of the other factors against Sebesta's motion. That said, the available evidence shows that counsel acted, at a minimum, very irresponsibly. DCFS Defendants' lawyers report that Sebesta's counsel spoke with them on November 4 to ask them not to oppose her motion for leave to file Sebesta's late summary judgment responses. Doc. 128 at 2. DCFS Defendants understandably refused counsel's request. *Ibid*. And then, Sebesta's counsel waited *another four weeks* before she filed the motion for leave to file.

Sebesta might have had a somewhat stronger (though still not meritorious) argument for excusable neglect if counsel's irresponsibility had been an isolated lapse in an otherwise admirable representation. But this was not counsel's first misstep. She was late in serving process upon the University of Illinois—which is not the most difficult defendant to find and serve. Doc. 39 (warning that continued failure to serve the University of Illinois would result in dismissal of the claims against that defendant for failure to prosecute). Then she missed a deadline to serve Rule 26(a)(1) disclosures, Doc. 60, even though the court had threatened to dismiss the case if she did so, Doc. 55. The court did not follow through on its threat—it denied Defendants' motion to dismiss based on the late service of the disclosures—but it warned Sebesta and counsel that it would tolerate no more delays. Doc. 60. And after *that*, counsel failed to make a full, timely disclosure of a proposed expert witness. Doc. 93. Counsel's repeated pattern of dilatory conduct weighs heavily against a finding that her delay in requesting an extension in this instance was excusable. *See Ammons-Lewis*, 543 F. App'x at 594 ("In reviewing the district court's decision [not to grant a retroactive extension] for abuse of discretion, we consider whether counsel had missed earlier deadlines or made other last-minute requests for extensions of time …."); *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 593 (7th Cir. 2012) (affirming the denial of an extension where the party requesting it "had requested several extensions throughout the course of the litigation"); *Raymond*, 442 F.3d at 608 (affirming the denial of a request for a retroactive extension where the party requesting it "had already obtained one extension, giving her 48 days in all, to file her response").

Given all this, Sebesta has not shown excusable neglect under Rule 6(b)(1)(B). It is for this reason that the court denied her motion for leave to file *instanter* her summary judgment responses. Doc. 130.

**B.      Facts**

Both University Defendants and DCFS Defendants filed Local Rule 56.1(a)(3) statements along with their summary judgment motions.  Docs. 102, 113.  Each assertion in the Local Rule 56.1(a)(3) statements cites evidentiary material in the record and is supported by the cited material.  *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.").  Sebesta did not timely file any response materials—no brief, no Local Rule 56.1(b)(3)(B) responses to the Local Rule 56.1(a)(3) statements, and no Local Rule 56.1(b)(3)(C) statement of additional facts—and, as just noted, the court denied her motion for a retroactive extension of time.

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [parties'] Local Rule 56.1 statements."  *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (internal quotation marks and alterations omitted); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions."); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005) ("[W]e have … repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1.") (alteration omitted).  Accordingly, for purposes of both summary judgment

motions, the court will accept as true the facts set forth in Defendants' Local Rule 56.1(a)(3) statements, viewing those facts and the inferences therefrom in the light most favorable to Sebesta. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Raymond*, 442 F.3d at 608; *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); *Koszola*, 385 F.3d at 1108-09; *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003). That said, the court is mindful that "a nonmovant's failure to … comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that it is entitled to judgment as a matter of law." *Raymond*, 442 F.3d at 608 (internal citation omitted). The court therefore will recite the relevant facts in Defendants' Local Rule 56.1(a)(3) statements and then determine whether, on those facts, Defendants are entitled to summary judgment.

Sebesta visited Swedish Covenant Hospital on September 1, 2010, when she was nine months pregnant. Doc. 102 at ¶ 7. She was referred to a psychiatrist after she told hospital employees that she had recently made suicidal statements and "trashed" her parents' apartment, that she could not return home because of polyurethane fumes, and that she would need in-home assistance after her daughter was born. Doc. 113 at ¶¶ 7-10. The psychiatrist observed that Sebesta was obsessed about a recently broken engagement with her child's father, that she exhibited signs of marginal to poor judgment and insight as well as bipolar I disorder, that she

lacked adequate support systems, and that she had a "nebulous living arrangement." Doc. 102 at ¶¶ 7-10. He reported that he had "grave concerns" about Sebesta's ability to care for herself, and he recommended that Sebesta be admitted as an inpatient at UIMC's obstetrical psychiatric unit. *Id*. at ¶¶ 10-12. Sebesta stayed at Swedish Covenant overnight, where her urine tested positive for cannabinoids in a toxicology screen. *Id*. at ¶ 13.

Sebesta was transferred to UIMC the next day, and she voluntarily agreed to be admitted to UIMC's obstetrical psychiatric unit. *Id*. at ¶¶ 14-15. A Psychiatric Nursing Assessment from UIMC described Sebesta as having an "angry" affect, an "irritable and grandiose" mood, and "verbose" speech. Doc. 113 at ¶ 16. It also stated that Sebesta was suspicious, "had delusions of grandeur," and "was preoccupied with thoughts of persecution." *Ibid*. Psychiatrists at UIMC noted that Sebesta had been psychiatrically hospitalized when she was a minor and had been treated by numerous psychiatrists in the past. *Id*. at ¶ 18. Their notes described Sebesta as "paranoid" and stated that she required observation "for her safety and the safety of her baby." *Id*. at ¶ 19.

Sebesta was discharged from UIMC's psychiatric unit on September 7, 2010. Doc. 102 at ¶ 16. She was admitted to UIMC again on September 26—this time to give birth. *Id*. at ¶¶ 18-19. Shortly after the delivery, Sebesta denied a pediatrician's request to perform a urine and meconium drug screen on the baby. *Id*. at ¶ 20. Sebesta explained that she did not want her daughter's life to be tainted by a positive drug test in her medical records. *Id*. at ¶ 21.

Davis, a licensed social worker employed by UIMC, visited Sebesta the next day. *Id*. at ¶ 23. Davis observed that Sebesta was easily triggered, was hostile and angry, had low insight into her psychiatric needs, demonstrated a lack of support to assist with the care of a newborn baby, and engaged in constant arguing with her mother. *Id*. at ¶ 25. Based on those

observations, as well as a review of Sebesta's medical records and the fact that she had to care for a newborn infant, Davis advised her to obtain outpatient psychiatric treatment after her discharge from the hospital. *Id.* at ¶ 26. Sebesta refused the suggestion. *Ibid.*

State law required Davis, as a social worker, to alert DCFS if she had "reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child." *Id.* at ¶ 29; 325 ILCS 5/4. Based on Sebesta's lack of a support system, her discordant relationship with her mother, her recent psychiatric hospitalization, the potential for exacerbation of psychiatric conditions in the period immediately after giving birth, and the vulnerability of newborn infants, Davis suspected that Sebesta's baby would be in danger under Sebesta's care. *Id.* at ¶ 28. On September 28, Davis called a DCFS hotline to report her suspicions, as she believed the law required her to do. *Id.* at ¶¶ 27, 31.

Sebesta was discharged from UIMC on September 29. *Id.* at ¶ 35. Sebesta's daughter had lost a concerning amount of weight, however, so a pediatrician delayed the baby's discharge for another two days. *Id.* at ¶ 36. Sebesta and her daughter left the hospital together on October 1. *Id.* at ¶ 37. Sebesta was never denied access to her daughter while the two of them were staying at UIMC. *Id.* at ¶ 38.

Meanwhile, Davis's call triggered an investigation into Sebesta by DCFS. Doc. 113 at ¶ 33. Childs, the DCFS Investigator assigned to the case, interviewed a pediatric resident at UIMC who had treated the baby; he told Childs that Sebesta had poor insight and was defensive, especially when she was around her mother, and that she had declined therapy. *Id.* at ¶¶ 34-35. Childs then interviewed Sebesta's mother, who told Childs that Sebesta had no mental health issues and that Sebesta would be staying with her after being discharged. *Id.* at ¶ 36.

Childs interviewed Sebesta on September 29, before she left the hospital. *Id*. at ¶ 39. Sebesta denied that she had a history of drug or alcohol abuse or mental health issues. *Id*. at ¶¶ 40-41. She told Childs that her hospitalization earlier that month had been her first psychiatric hospitalization. *Id*. at ¶ 41. She also told Childs that she had been hospitalized only because her father, to punish her after a fight, falsely told police that she had threatened suicide. *Ibid*. Sebesta also said that she was afraid that her parents would take her baby, and that she was worried about fumes in her apartment. *Ibid*.

Childs next interviewed Davis, who told her that Sebesta was resistant to counseling and seemed defensive when Davis asked her about her recent psychiatric hospitalization. *Id*. at ¶ 42. Davis also provided Childs with Sebesta's medical records. *Ibid*. Another doctor told Childs that Sebesta had anxiety. *Ibid*.

Childs met with Bean, her supervisor, on September 30. *Id*. at ¶ 46. Bean noted that Sebesta had refused psychotropic medication and therapy, and she told Childs that she would initiate removal proceedings against Sebesta in juvenile court if Sebesta refused any more services. *Ibid*. Childs relayed the threat to Sebesta, telling her that the DCFS would take custody of the baby unless Sebesta agreed to "intact family services"—a bundle of in-home child-welfare and counseling services administered by Catholic Charities, a private charitable organization. *Id*. at ¶ 48, 58-68. Sebesta relented, and she participated in intact family services from December 2010 until May 2011. *Id*. at ¶ 61.

Bean and Childs also decided to take a bureaucratic action against Sebesta called an "indicat[ion] for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect." *Id*. at ¶¶ 53-54. DCFS sent Sebesta a letter on November 25, 2010, notifying her that she was so indicated. *Id*. at ¶ 54. It is unclear from the record what an

"indication" entails, although the Seventh Circuit has explained that the State retains records of indications in a central register, that potential employers conducting background checks can access the register, and that a person subject to an indication is barred from certain employment providing access to children. *See Cookson v. Schwartz*, 556 F.3d 647, 654 (7th Cir. 2009); *Dupuy v. Samuels*, 397 F.3d 493, 497-98 (7th Cir. 2005); *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 610 (7th Cir. 2002). Sebesta lodged a formal objection to her indication with DCFS, Doc. 113 at ¶ 66, and DCFS voluntarily "unfounded" the indication on April 22, 2011, *id.* at ¶ 67.

Sebesta later brought this suit under § 1983 and Illinois law. Her amended complaint makes three claims: (1) that every defendant violated her substantive due process right to familial relations—University Defendants by reporting her to DCFS, and DCFS Defendants by "indicating" her and by coercing her into submitting to intact family services with threats to remove the baby from her custody; (2) that University Defendants violated her state law right to privacy when they reported her to DCFS, thereby placing her "in a false light before the public"; and (3) that University Defendants committed the state law tort of intentional infliction of emotional distress by reporting her to DCFS. Doc. 46 at ¶¶ 16-29.

## Discussion

The court discusses first the state law claims against University Defendants and then the federal constitutional claims against both sets of defendants.

## I.      State Law Claims

An Illinois statute, the Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq.*, requires certain professionals to report suspected cases of child abuse and neglect to DCFS. 325 ILCS 5/4. In exchange for threatening liability for failures to report,

ANCRA shields reporters from civil liability arising out of reports that they make in good faith.

Specifically, the statute provides:

> Any person, institution or agency, under this Act, participating in good faith in the making of a report or referral, or in the investigation of such a report or referral … shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such actions.

325 ILCS 5/9.  It also provides that "the good faith of any persons required to report … cases of suspected child abuse or neglect … shall be presumed."  *Ibid.*

There is no genuine dispute on the summary judgment record that Davis reported Sebesta to DCFS in good faith.  For one, University Defendants' Local Rule 56.1(a)(3) statement asserts that Davis believed that she was legally required to place the call.  Doc. 102 at ¶ 31.  Because Sebesta missed her chance to contest that assertion, the court accepts it as true.  *See* N.D. Ill. L.R. 56.1(b)(3)(C); *Parra*, 614 F.3d at 636; *Rao*, 589 F.3d at 393; *Cady*, 467 F.3d at 1061.

And if that were not enough to establish Davis's good faith, ANCRA's presumption would be.  Federal courts adopt state substantive rules when exercising supplemental jurisdiction over state law claims, *see McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014), and evidentiary presumptions are substantive rules.  *See Dick v. N.Y. Life Ins. Co.*, 359 U.S. 437, 446 (1959) (in a diversity case, applying a state law presumption that a death was not a suicide); *Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 770-71 (7th Cir. 2003) (applying ANCRA's good-faith presumption to state law claims).  Plaintiffs could have rebutted ANCRA's good-faith presumption by "present[ing] evidence sufficient to support a finding of the nonexistence of the presumed fact."  *Franciski*, 338 F.3d at 770 (internal quotation marks and citation omitted); *see also Pryweller v. Cohen*, 668 N.E.2d 1144, 1150 (Ill. App. 1996).  Again, however, Sebesta has not validly presented any evidence at all, much less evidence capable of rebutting the presumption.

For these reasons, University Defendants are entitled to summary judgment on Sebesta's state law claims. And by failing to respond to University Defendants' grounds for summary judgment, Sebesta has forfeited any argument to the contrary. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.").

## II.  Federal Claims

Because ANCRA is a state statute, it cannot protect Defendants from Sebesta's federal constitutional claims. *See* U.S. Const. Art. VI, cl. 2 ("This Constitution … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir. 1973) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 … cannot be immunized by state law."). Even so, the federal claims fail.

Substantive due process protects a "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."). For instance, substantive due process limits the ability of States to force parents to accept unwanted contact between their children and their children's grandparents, *see Troxel*, 530 U.S. at 67, or to enroll their children in public schools, *see Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925).

That said, "[t]he constitutional right to familial integrity is not absolute; rather, it must be balanced against the state's interest in protecting children from abuse." *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011); *see also Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) ("[T]his liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents.") (quoting *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). In determining the constitutionality of government interference with family relations, a court must apply "the same reasonableness test used to evaluate Fourth Amendment claims," which requires consideration of: "(1) the nature of the privacy interest upon which the action taken by the State intrudes; (2) the character of the intrusion that is complained of; (3) the nature and immediacy of the governmental concern at issue; and (4) the efficacy of the means employed by the government for meeting this concern." *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003). State officers may not remove a child from her

parents' custody without "evidence to support a 'reasonable suspicion' of past or imminent abuse." *Siliven*, 635 F.3d at 928 (quoting *Terry v. Richardson*, 346 F.3d 781, 787 (7th Cir. 2003)).

University Defendants did not violate Sebesta's substantive due process right to custody over her baby, for although they did interfere with Sebesta's relationship with her baby, the interferences were slight and overwhelmingly justified. A UIMC pediatrician delayed the baby's discharge from the hospital, but she did so for sound medical reasons (the baby needed to gain weight before it would be safe to take her home), the delay lasted only two days, and Sebesta was never separated from the baby during that time. Doc. 102 at ¶¶ 36, 39-40.

Nor did University Defendants violate Sebesta's substantive due process rights when Davis reported her to DCFS, knowing that the report would trigger an investigation. With support from the First and Fifth Circuits, University Defendants argue that "the right to familial integrity does not include the right to be free from child abuse investigations," and therefore that Davis's call could not have violated the Constitution, even if it were entirely unreasonable. Doc. 116 at 9; *see Croft*, 103 F.3d at 1125 ("The right to familial integrity … does not include a right to remain free from child abuse investigations."); *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993) ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."). That is not the law in the Seventh Circuit, however. In *Heck*, state officials interviewed children at a private school about the school's corporal punishment policy, and the children's parents sued the officials for violating their substantive due process right to familial relations. The Seventh Circuit held that, because the officials had no reason to believe that the parents were complicit in any abuse of their children but nevertheless "target[ed] the plaintiff parents as child abusers (i.e., open[ed] files on them and interview[ed], or

attempt[ed] to interview, their children without their consent)," the officials violated the Constitution. 327 F.3d at 521-22. In other words, the right to familial relations *does* include a right to be free from unreasonable child abuse investigations, and the defendants in *Heck* violated that right.

University Defendants, by contrast, did not violate that right. Again, courts considering substantive due process familial relations claims must balance the plaintiff's interest in familial integrity against the government's interest in protecting children, taking into account the nature of the government's intrusion and the reasonableness of the government's belief that the intrusion is necessary. *Id*. at 520. That balance easily comes out in Davis's favor. While the mere triggering of a child abuse investigation is an intrusion, it is a minor one, *cf. Croft*, 103 F.3d at 1125; *Watterson*, 987 F.2d at 8, and it was well justified in this case. Sebesta had recently been hospitalized for psychiatric issues after a psychiatrist had expressed "grave concerns" about her ability to care for herself, Doc. 102 at ¶¶ 10, 14-16; other psychiatrists and nurses had characterized her as "paranoid," as having delusions of grandeur, and as "preoccupied with thoughts of persecution," Doc. 113 at ¶¶ 16, 19; her urine had tested positive for cannabinoids when she was nine months pregnant, Doc. 102 at ¶ 13; she had refused drug testing of her newborn child, Doc. 102 at ¶ 21; she had refused further psychiatric treatment, *id*. at ¶ 26; and she had a chaotic relationship with her family, *id*. at ¶¶ 10, 25. Those circumstances may not have justified removing the baby from Sebesta's custody altogether, but they certainly justified Davis in alerting DCFS about her concerns. University Defendants accordingly are entitled to summary judgment.

DCFS Defendants intruded more seriously into Sebesta's relationship with her daughter when they threatened to remove the baby from her home in order to coerce her into agreeing to

in-home counseling services administered by Catholic Charities.  Still, Sebesta's constitutional claims against DCFS Defendants fail because of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).  "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct."  *Ibid*.  To remove the shield of qualified immunity from DCFS Defendants, the constitutional right that they allegedly violated must have been clearly established as of late 2010 or early 2011 "in a particularized sense" and not merely "at a high level of generality."  *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (internal quotation marks omitted); *see also Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "The basic question is whether the state of the law at the time that [DCFS Defendants] acted gave [them] reasonable notice that [their] actions violated the Constitution."  *Elyea*, 631 F.3d at 858.

Rather than decide whether the threat to take Sebesta's daughter violated substantive due process, the court will exercise its discretion to begin with the second qualified immunity question, which is whether the threat violated clearly established law.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014).  It did not.  By early 2011, the Seventh Circuit had dealt with a few substantive due process cases involving threats to remove children from their parents' custody.  *Heck* was one such case; there, a state officer threatened to take custody of two children unless their parents agreed to be interviewed. The court held that, because the officer lacked any suspicion that the parents were abusing the

children (again, the investigation revolved around corporal punishment at a private school that one of the children attended), the threat was unconstitutional. 327 F.3d at 524. *Dupuy*, by contrast, held that child protection officials who suspect that children are being abused or neglected may threaten to take the children unless the parents under suspicion agree to live temporarily away from home. Those threats were held constitutional because, unlike in *Heck*, the officials actually and reasonably believed that they had the legal right to do what they threatened to do. 465 F.3d at 762-63.

*Heck* and *Dupuy* established the general proposition that *some* threats to separate children from their parents violate the Constitution. They did not, however, give Childs and Bean reasonable notice that *their* particular conduct was unconstitutional under the circumstances of this case. To repeat: Sebesta had a recent psychiatric hospitalization, Doc. 113 at ¶¶ 15-20; a psychiatrist expressed grave concern that she could care even for herself, Doc. 102 at ¶ 10; she tested positive for drugs while she was pregnant, Doc. 113 at ¶ 9; she refused to allow her newborn baby to be tested for drugs because, as she frankly admitted, she worried that the test would be positive, Doc. 102 at ¶ 21; her relationships with her family were tempestuous—in fact, she had recently "trashed" her parents' apartment, *id*. at ¶¶ 10, 25; Doc. 113 at ¶ 7; and she refused to seek further psychiatric treatment, *id*. at ¶ 26. Those facts at least *arguably* made it reasonable for Childs and Bean to suspect that Sebesta's daughter, a defenseless newborn baby, would be abused or neglected under Sebesta's care. *Cf. Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013) (holding that qualified immunity protected officers sued for performing an unlawful search or seizure in violation of the Fourth Amendment if they acted on the basis of "arguable probable cause"). The facts here also differ significantly from the facts in *Heck*—a case in which the defendant officer lacked *any* suspicion that the parents were endangering their

children, much less a reasonable one—and what matters for qualified immunity is "whether it was clearly established that the [Constitution] prohibited the officer's conduct in the situation she confronted." *Luna*, 136 S. Ct. at 309.

The amended complaint also alleges that Childs and Bean violated Sebesta's substantive due process rights by "'indicat[ing]' or approv[ing] the indication of Sebesta" during the course of their investigation. Doc. 46 at ¶ 17. The facts supporting this allegation are hard to pin down. The complaint states that on November 25, 2010, Childs and Bean caused DCFS to "indicate[] Sebesta for 'Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect,'" *id*. at ¶ 13, and DCFS Defendants' Local Rule 56.1(a)(3) statement supports that allegation. Doc. 113 at ¶ 54 ("On November 25, 2010, [DCFS] notified Plaintiff by mail that she was indicated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect."); *id*. at ¶ 66 (explaining that Sebesta wrote to the DCFS "Administrative Hearings Unit" to appeal the "indicated finding of neglect"); *id*. at ¶ 67 ("On April 22, 2011, the Department voluntarily unfounded Plaintiff's indicated finding and removed Plaintiff's name from the State Central Register."). There is no evidence in the record, however, showing that any consequences typically flow from an "indicated finding of neglect" that is later unfounded, and the amended complaint does not allege that Sebesta suffered any such consequences. The indication likely caused Sebesta to worry that DCFS would take her daughter, but, as the court has already explained, even Childs and Bean's explicit threat to take the baby violated no clearly established rights.

Qualified immunity therefore bars Sebesta's claims against DCFS Defendants. And, again, because Sebesta did not respond to any of Defendants' asserted grounds for summary judgment on her federal claims, she forfeited any legal arguments against summary judgment.

*See Batson*, 746 F.3d at 833; *G & S Holdings*, 697 F.3d at 538; *Judge*, 612 F.3d at 557; *Salas*, 493 F.3d at 924.

## Conclusion

For the foregoing reasons, both summary judgment motions are granted.  With all claims resolved, judgment will be entered in favor of Defendants and against Sebesta.

January 20, 2016

_____
United States District Judge